## James Ellars, Conservator,

### v.

## William H. Mossbarger, use, etc.

CONTRACTS OF INSANE PERSON—NOTE.—In this case, insanity, both before and after the execution of the note, is shown to have existed, so near to that event as to leave but a very few hours for a lucid interval to have intervened. The peculiar character of the mania was such as to have led the maker of the note to do the very act, in a moment of insanity, which it is insisted he did in a lucid interval. The rule of law is, that when insanity is once shown to exist, it is presumed to continue until the contrary is shown. The maker of the note was not a free or responsible agent and the note must be held void.

ERROR to the Circuit Court of Moultrie county; the Hon. C. B. Smith, Judge, presiding. Opinion filed October 19, 1881.

Messrs. Eden & Clark, for plaintiff in error.

Ellars v. Mossbarger.

Messrs. CREA & EWING, for defendant in error; that if Cox had a lucid interval at the time of the execution of the note, · he is bound by it, cited Lily v. Waggoner, 27 Ill. 395; McCormick v. Littler, 85 Ill. 62.

McCULLOCH, J.  This was a suit brought by defendant in error against plaintiff in error, as conservator of Milton H. Cox, who was adjudged to be insane on or about the 13th day of February, 1878.  The suit was upon a promissory note, dated January 16, 1878, but in reality made on the 17th day of that month, and made payable to defendant in error.

Two defenses were set up in the court below:  *First*, That the note was given without consideration; *Secondly*, That at the time of its execution the maker was insane; to which a further objection is now added, namely, that a suit at law will not lie in this State against the conservator of an insane person.  We deem it necessary to notice only the second of these defenses.

It appears, from the evidence, that one Absalom Spray, whose sister was the wife of said Milton H. Cox, had become seriously involved in debt, on account of which he left this State and went to reside in Kansas.  This occurred in the month of December, 1877, and Cox at that time seemed to be considerably exercised about hurrying Spray's departure. The note in controversy and one or two others, amounting in all to about $400, were given on the same date in settlement of Spray's indebtedness, without any solicitation on the part of Spray, and wholly without his knowledge.

At the time the notes were given those with whom he transacted the business saw nothing in his conduct to cause any doubt of his sanity.  He seemed to transact the business intelligently, and nothing unusual seemed to be noticed about him.  Some days prior to this transaction he had been garnisheed by some of Spray's creditors and had appeared and answered to the garnishee.  He employed an attorney to assist him in making the settlement, who says, in his testimony, that he impressed upon Cox the necessity of securing himself before assuming any of Spray's liabilities, but he seemed to think there was no necessity for it, and wanted the business settled.

It is for these and other like reasons, insisted on the part of defendant in error, that even if insanity before the execution of the note is shown to have existed, yet it was of such a character as to admit of lucid intervals, during one of which intervals the note was made.

Prior to November, 1877, nothing unusual was noticed in Cox's mental condition. About the first of January, 1878, said Absalom Spray visited him and observed that his actions were unnatural, and that he complained of his head hurting him; that prior to that time he had been quiet and had but little to say, but was then talkative, more sociable and very nervous.

Harrison Spray, another brother-in-law, who had seen him frequently during several preceding months, says he appeared wild, visionary and unnatural; that he became fearful that others were going to injure him; that from an industrious, hard working and careful man, he had become negligent, and took no interest in his affairs; that he had become cross to his family and threatening to his neighbors.

Lewis B. Spray, another brother-in-law, lived in the same house with Cox from November, 1877, until the day the note was given. About November he noticed a change in Cox's actions. He would go out to gather corn, work at it about half a day and then quit; would complain of great pain in his head, and would look wild and fierce; he became negligent of all his business; paid no attention to his farm stock, and let everything go as if he had no interest in it; was all the time talking of breaking up; threatened to knock a neighbor down, and became so vicious everybody got afraid of him. In December he became afraid that he and those about him would be sent to the penitentiary; devised plans of concealing himself and then escaping from imaginary pursuers, and threatened to kill some of his relatives and also himself, to get out of misery. Such was the general nature of his malady, which is abundantly proved by other witnesses besides these. To what extent he was influenced thereby is shown by what follows:

When informed of his brother-in-law's difficulties, he swore he would go and pay his debts. From that time on, his affairs seemed to give him much concern. On the day before the

note was given, he started from his home with a team and load·
of wheat to go to Lovington, to sell the wheat, and came back
the next morning without the team; his rubber boots, which
were new when he started, being all snagged, torn and spoiled.
He said he had been running all night; that they had been
after him all night; that he heard them pecking on the fence
behind him when he went over; that they were then ready to
surround him and he should not run any more; they might
just come and take him; that he had left the team and run
from them, and expressed fears that if they caught him they
would kill him or send him to the penitentiary.

John Bowers says that on the day before this he saw Cox's
wagon standing in the road near Mortland's, with one horse
hitched to it, but the other was gone. Mr. Mortland saw the
horse there and put it in his barn, and kept it until the next
day, when a son of Cox came for it. This was two miles east
from Lovington. The son found the other horse six miles
north from there.

With the terrors of this fearful night still hanging over
him, Cox again left home on foot to go a distance of five miles,
to Atwood, where this settlement was made. His sole pur-
pose now seemed to be to rid himself from his fears, by set-
tling with his imaginary pursuers. As before noticed during
the progress of this settlement, nothing out of the way was ob-
served in his actions. Having settled the matter up he re-
turned home.

On the very next day after this settlement Cox again left
home on foot and went to Isabel in Edgar County, near to
where his father lived. His wife followed him there and en-
deavored to induce him to return home but failed. Plaintiff
in error was then requested to go and bring him back. He at
first refused to go home, but was at length prevailed upon to
go. He then said he would be broken up, and that they
were after him to send him to the penitentiary. Plaintiff
asked him why he had left his team at Lovington the day be-
fore he gave the notes. He said they were after him all night;
that they had given him a hard run; that they would kill
him or send him to the penitentiary. He said he had slept

that night behind a log about five miles north from home. When asked why he had given the notes, he said he owed Spray nothing, but if he had not given the notes, they would have sent him to the penitentiary.

The evidence leaves no doubt upon our minds that for more than a month preceding and up to the very day on which the note in question was given, and from that day until he was finally adjuged insane, he was and continued to be insane. The rule of law is that when the fact of insanity is once established, it is presumed to continue until the contrary is shown.

In this case insanity, both before and after the execution of the note, is shown to have existed so near to that event as to leave but a very few hours for a lucid interval to have intervened. The peculiar character of the mania was such as to have led Cox to do the very act in a moment of insanity, which we are now asked to believe he did in a lucid interval; and we are asked to believe that a lucid interval did occur, from the very fact that he seemed to transact this business in an intelligent manner. We cannot accept this as satisfactory proof of the fact sought to be established. The act was such an one as might have been prompted by and performed in the hour of his madness. We cannot accept the doing of the act, or the acts preceding and leading up to the very act itself, as proof of his sanity. For days afterwards he was still haunted with the idea that if he had not given the notes he would either have been killed or sent to the penitentiary, and the giving of the notes did not relieve him from his distress. The condition of his mind seems to have been no better than if he had executed the notes under actual duress of life or imprisonment. He was therefore not a free or responsible agent, and the note must be held void.

Defendant in error admits that he can produce no further testimony upon the question of the sanity of Cox at the time of the execution of the note in question, and consents. that if we find against him on that question, the judgment of the court below may be reversed without remanding the cause, which will be done.

Judgment reversed.